BOARD OF EDUCATION OF BLADEN COUNTY v. BOARD OF COMMISSIONERS OF BLADEN COUNTY.

*Public Schools—Limitation of Taxes—Constitution—Board of Education—Board of County Commissioners.*

1. The Constitution, Article IX., § 3, requiring public schools to be open four months every year, does not authorize the County Commissioners to levy a tax beyond the limitation imposed by Article V., section 1; and section 23, chapter 174, Laws of 1885, authorizing tax beyond this limitation is void. This case is governed by *Barksdale* v. *Commissioners*, 93 N. C., 472.

2. Unless it be made to appear that there was palpable error or mistake, this Court will stand by former decisions.

3. The Constitution, Article V., fixes the limitation for ordinary purposes—State and County—to two dollars on three hundred dollars worth of property and two dollars on the poll; and by Article V., § 6, the counties cannot exceed the double of the State tax, except for special purpose and with the special approval of the General Assembly.

4. *Quæry*, if the General Assembly are so fettered by the limitation of Article V., § 1, that they cannot provide for the maintenance of public schools, as required by Article IX., § 3, in the same way as they may provide for a casual deficit, or the payment of the public debt, or interest on the same, or for the suppression of invasion and insurrection.

AVERY, J., dissenting.

This was a CIVIL ACTION, heard before *Winston, J.,* at the Fall Term, 1892, of BLADEN Superior Court, upon complaint and answer.

The object of this action, brought by the County Board of Education, was by *mandamus* to compel the Board of County Commissioners of Bladen County to levy a tax beyond the constitutional limitation of Article V., section 1, in order to keep the public schools open for four months, as prescribed by Article IX., section 3 of the Constitution. The Court upon this point gave judgment against the Board of Education, and they appealed to the Supreme Court.

*Mr. Theo. F. Davidson, Attorney General,* and *Mr. J. B. Batchelor,* for plaintiff.

No counsel, contra.

MACRAE, J.: The questions presented for our consideration are precisely the same as those which are determined in the case of *Barksdale* v. *Commissioners,* 93 N. C , 472, wherein it was held that while it is the duty of the County Commissioners, under Article IX., section 3 of the Constitution of North Carolina, to keep the public schools open for at least four months every year, yet, in discharging this duty, they cannot disregard the limitations imposed by Article V., section 1, as to the amount of tax to be levied; and that section 23 of chapter 174 of the Laws of 1885, which requires the Commissioners, if the tax levied by the State for this purpose shall be insufficient to carry it into effect, to levy annually a special tax to supply the deficiency is unconstitutional, because it is not such a special tax for county purposes as is provided for by Article V., section 6 of the Constitution.

The subject has been so recently and thoroughly discussed in the opinion delivered by Chief Justice SMITH for the Court, and in the dissenting opinion of the then Associate Justice MERRIMON, with all the authorities on both sides, that we deem it unnecessary to recite the reasons upon which a conclusion was then reached by a majority of the Court.

We have been induced to give the questions a careful reconsideration, and have listened with interest to the able argument of counsel who have sought to induce us to put a different construction upon the Constitution than was announced in the decision above referred, and to hold that it is the duty of the County Commissioners to obey the mandate of the Act of 1885, and levy the additional tax sufficient to make up the deficiency, caused by the failure of the General Assembly to provide funds to maintain the schools for at least four months in the year. But we are constrained by

the principle involved in the maxim *stare decisis*, in which is bound up the stability of judicial decision, on which depends not only respect for law, but knowledge of law, so necessary to be possessed by those whose duty and business it is to advise the people on all matters concerning their interests, to abide by the decisions of the Court, unless it be made to appear that there was palpable error or mistake. When there is room for construction, and reasons may be adduced on both sides of a matter in controversy, the certainty of a rule is of more importance often than the reason of it.

In saying this, we do not wish it to be understood that, were the question before us an open one, we should reach a different conclusion upon it than has been declared by the Court.

The subject of taxation, general and special, by State and counties, has been considered in a long line of judicial decisions, beginning almost immediately upon the adoption of the Constitution of 1868. It is well settled that, for the ordinary expenses of government, both State and county, the first section of Article V. of the Constitution places the limit of taxation and preserves the equation between the capitation and the property tax—the capitation tax never to exceed two dollars, and the tax upon property valued at three hundred dollars to be confined within the same limit. It is also settled in the same manner that by Article V., section 6, the counties may not exceed the double of the State tax, within the equation, except for a special purpose and with the special approval of the General Assembly. It appears from an examination of the authorities that no case has ever come before the Courts involving the exercise of this special power of taxation by the counties, except upon special or private acts for local objects, until the Act of 1885 was brought to our attention, wherein, in a public act ("An Act to amend the public school law, ch. 15 of *The Code*"), it is sought by section 23 to require a special tax in the county to supply

the deficiency in the sum raised by general taxation and appropriation for public school purposes, under the requirements of Article IX. of the Constitution, in section 2 of which " the General Assembly * * * shall provide by taxation and otherwise for a general and uniform system of public schools wherein tuition shall be free of charge to all the children of the State between the ages of six and twenty-one years."

It was held in Barksdale's case, *supra,* which we are now asked to review, that this section 23 of the Act of 1885 was not warranted by section 6 of Article V. of the Constitution, because it was not such a special tax for local objects as was contemplated in the last-named section. We see no reason to doubt the correctness of the decision of the Court upon this question, if it were now open to us for revision. The reasons are given and cases cited in the opinion of the Chief Justice in the case referred to, and it would be but cumbering the books for us to reproduce them here.

Were the question presented to us of the power of the General Assembly to deal with the matter and provide adequate means for the necessary expenses incident to the maintenance of the public schools under the requirement of Article IX., by general taxation, unfettered by any limitation of Article V., section 1, in the same manner as they may provide for a casual deficit, or for the payment of the public debt or interest on the same, or for the suppression of insurrection or invasion, we might possibly find a solution of the apparent difficulty which has resulted in a failure in some counties to maintain the schools for at least four months in every year. But, as the question may never arise, we will not discuss it.

We are content to abide by the decision of the Court in Barksdale's case, and declare that, in the judgment of his Honor below, following that decision, there is

No Error.

AVERY, J., dissenting: Entertaining the most profound respect for the views of my brethren, I feel, nevertheless, constrained to give expression to the reasons that have impelled me to the conclusion that a most important provision of the organic law has been misconstrued, and the will of the people, as embodied therein, has been thwarted by restricting the right of the Legislature to delegate to the counties the power to levy tax for the maintenance of public schools. If the Court has fallen into error, it is a misconception that vitally concerns the public welfare. In the face of this constitutional inhibition the Legislature is no longer left free to enact and enforce uniform and liberal laws for sustaining our schools and elevating and educating the ignorant classes of our people. Experience and observation have shown that education and morality advance hand in hand, while ignorance and vice are, as a rule, as constant companions. Acting upon the enlightened and philanthropic idea that crime could be best combatted, and happiness promoted by the refining influences of religion, morality and learning, the framers of our fundamental law dug deep and made mandatory public education as one of the bedstones upon which the Constitution rests. The provisions which apply specifically to this subject are sections 1, 2 and 3 of Article IX., the material portions of which are as follows:

" 1. Religion, morality and *knowledge being necessary* to *good government* and the happiness of mankind, schools and the means of education shall forever be encouraged.

" 2. The General Assembly, at its first session under this Constitution, *shall provide, by taxation* and otherwise, for a general and uniform system of public schools, wherein tuition shall be free of charge to all children of the State.

" 3. Each county of the State shall be divided into a convenient number of districts, in which one or more public schools shall be maintained at least four months in every year, and if the Commissioners of any county shall fail to comply

with the aforesaid requirements of this section, they shall be liable to indictment."

This, like many other expressions of the sovereign will embodied in the Constitution, is not only addressed to and obligatory upon the Legislature, but likewise appeals to and deals directly with its agencies for local government, the counties, and arms the Courts with power to stimulate the Commissioners to diligence.   Starting out with the announcement, as solemn and binding and as clear and comprehensible as any fundamental principle transplanted from Magna Charta into our Declaration of Rights, that knowledge, as the handmaiden of religion and morality, is essential to the perpetuity of good government, two conventions of the people have deliberately and solemnly ordained that the system which "shall be maintained," must meet this necessity by compliance, on the part of the Legislature, with certain requirements of the instrument, and that the aid of the criminal law also shall be invoked, if necessary to insure the enforcement of the constitutional mandate. .

1. It was made the duty of the Legislature, without delay, at its first session, both after the ratification of the Constitution in 1868 and in its amended form in 1876, to provide for a " general and uniform system " by taxation or otherwise.

2. The County Commissioners were required to fix the bounds of the districts in which one or more schools were to be maintained four months, &c.

3. The County Commissioners are declared liable to indictment for an offence created by the Constitution, to-wit, the failure to comply with this section, not only by neglecting or refusing to lay off the limits of the districts, but by omitting to keep up the schools.

How could the law-making power provide a general and uniform system of schools, so that the counties, as public agencies, should have the power, which they were liable to punishment for not exercising, of keeping up public schools

for four months in the year in localities designated by them? Section 5, Article IX., appropriates to the school fund of the counties the clear proceeds of penalties and forfeitures collected, and all fines for breaches of penal or military law, paid within their respective borders. The State system must be uniform, " but the funds necessary for the support of the public schools are not derived exclusively from the State," said the late Chief Justice MERRIMON in *Greensboro* v. *Hodgin*, 106 N. C., 187. The Constitution plainly contemplates and intends that the several counties, as such, shall bear a material part of the burden of supplying such fund." In a subsequent portion of the same opinion, in construing section 4, Article IX., the Court say : " It is likewise required that the fund supplied by the counties shall supplement that of the State and be distributed in the counties supplying the same, as pointed out above," viz., so as to insure the maintenance of a school for four months in the several districts. Obviously, it is impracticable for the Legislature to so adjust the State taxation and distribution of the fund arising from it, that the same per centum of tax, with fines, forfeitures and penalties superadded, shall provide anything like uniformity in the duration or character of the schools. The division of the fund, raised by State taxation, according to the number of children within the school age under the general law providing for its distribution, has been declared uniform and constitutional. *Greensboro* v. *Hodgin, supra.* But it is manifest that unless the local authorities of the several counties may exercise the power delegated to them by the Legislature to make a sufficient supplement, the share of one county may maintain schools for ten months, while that allotted to another, where school children are not numerous and are scattered over a sparsely settled region, and where the amount paid in the shape of penalties is insignificant, may not prove sufficient to keep the schools open for one month in the whole year. The only criminal offence created and defined by the

Constitution itself, is that mentioned in section 3. It is difficult to understand why this wide departure from the usual course was made, unless we interpret it as emphasizing the intent of the framers of the Constitution that the officers held subject to this unusual liability should have power co-extensive with their accountablility. The Legislature, in enacting the law under which the tax was levied, manifestly placed this interpretation upon the sections which we have quoted, and in the construction of laws great respect should be shown to the opinion of the law-making power, and statutes solemnly enacted by the Legislature should be declared unconstitutional only when they are plainly repugnant to the provisions of the organic law.

Counties and towns are created by the Legislature for public convenience, and may be destroyed at any moment by the authority that gave them existence. *Lilly* v. *Taylor*, 88 N. C., 489; 10 Myers Fed. Dig., §§ 2424, 2425, 2026. The only limit upon the law-power is to be found in the restrictive clauses of the Federal and State Constitutions. 1 Dillon Mun. Corp. (3d Ed.), §§ 65–68, *et seq.; Barrington* v. *Ferry Co.*, 69 N. C., 165. Duties and burdens may be devolved upon the governing officers of counties against their will, and in the absence of a restraining provision in the organic law, counties may be even compelled to assume the liabilities of towns lying within their borders. Cooley Const. Lim. (4 Ed), 295, 296, star page 241; 1 Dillon, *supra*, §§ 60 (35) to 65 (38); *Commissioners* v. *Ballard*, 69 N. C., 18; *Commissioners* v. *Commissioners*, 79 N. C., 565, and 95 N. C., 189. The Legislature may devote the streets, or other property of a town, to a public purpose, or, if such action does not violate the rights of creditors, it may modify or repeal a tax levy already laid by its authorities, or modify its action in any other respect. 1 Dillon, *supra*, § 70 (40) to § 77; *Bridge Co.* v. *Commissioners*, 81 N. C., 491; *Carrow* v. *Toll-bridge Co.*, Phil., 118. The statute which has been pronounced invalid (section 23, chapter 174, Laws of

1885) is amendatory of *The Code*, § 2590, and requires the County Commissioners, where the tax levied by the State proves insufficient to maintain one or more schools in each school district for four months in the year, to levy annually "a special tax to supply the deficiency for the support and maintenance of said schools for said period of four months, or more." It is obvious that if there were no constitutional restriction upon the power of the Legislature, it was authorized and expressly required to pass just such a law as that enacted. Was its power exceeded in passing it? The Constitution of 1868, Article VII., § 2, provided that it should be the "duty of the Commissioners to exercise a general supervision and control of the penal and charitable institutions, schools, roads, bridges, levying of taxes and finances of said county as may be prescribed by law." The amendment of 1875, which took effect January 1, 1877 (Article VII., § 14), provided that "the General Assembly shall have full power by statute to modify, change or abrogate any and all of the provisions of this article and substitute others in their place, except sections 7, 9 and 13." The Act of 1876-'77, chapter 141, was passed in the exercise of the power given under section 14, Article VII., and, after providing for the election of County Commissioners, and the levying of taxes with the assent of the Justices of the Peace, declares, in section 6, that they "shall have and exercise the jurisdiction and powers vested in the Board of Commissioners *now existing*, and also those vested in and exercised by the board of trustees, &c., except as may be hereafter provided by law."

Construing the Constitution of 1868 together with the amendment of 1875 and the Act of 1876-'77, it is manifest that before 1875 there was this further recognition of the right and duty of the County Commissioners to overlook the schools as a part of the ordinary and necessary county government, and that the Act of 1876-'77, passed in pursuance

of the amendment of 1875, left this power and obligation still intact.

But despite of all these constitutional and statutory grants of power and injunctions of duty, it is contended that section 1, Article V. of the Constitution, limits the levy for ordinary purposes to not more than two dollars on the poll or sixty-six and two-thirds cents on every hundred dollars in value of land, that the education of the people of a county is not a county purpose, and the Act of 1876–'77 does not provide for levying a "special tax," though the Legislature expressly so denominated the tax to be levied in every instance when there should be a deficiency in the appropriation by the State. Is education a county purpose? No one has ever contended that a tax providing for the support of the penal and charitable institutions of a. county, or for building bridges across streams at the public crossings in its limits, is not a county purpose; or, if such a position has ever been assumed, it will no longer be insisted on in view of the decisions of this Court and the constant practice of the Legislature. *Barrington* v. *Ferry Co., supra.* When we find the word "schools" sandwiched between charitable institutions and roads in the constitutional definition of the duties of Commissioners who are the embodiment of the municipal corporation, it would seem unreasonable to insist that an answer to an alternative mandamus, which stated that a levy of twenty cents on the hundred for support of prisoners in the jail and the poor, ten cents to make up the deficiency in school appropriation, and five cents for payment of damages assessed for public roads opened by order of the Commissioners, raised the tax in the aggregate, with that levied by the State, to the constitutional limit, would not be deemed sufficient to relieve the Commissioners from attachment for contempt. *Fry* v. *Commissioners*, 82 N. C., 304. The distinction between taxes levied under a power which associated schools with roads and bridges, and between

those devoted to one purpose or other, seems to me to be clearly arbitrary and unreasonable. When the Constitution declares that knowledge is " necessary to go )d government," and that particular agents of the State, the County Commis- sioners, shall be indicted for failure to provide means of acquiring it, I cannot yield my assent to the proposition that it is a part of the appropriate public duty of those offi- cers to protect the health of the people of the county by levying a tax for the purpose of constructing hospitals, if need be, or for opening new roads, or erecting bridges, while the Legislature cannot even clothe them with authority by a special act applicable to all of the counties in the State to levy and collect any sum for the intellectual betterment of the people of the county. It seems to me that the framers of the Constitution not only intended that the Commission- ers should be empowered and required, as a part of their regular duty, to open roads and provide for the payment of the expense of punishing criminals, but that above all these other functions should be that of furnishing the means and facilities for acquiring knowledge.

If the maintenance of schools is a county purpose, then the remaining question is whether it is competent for the Legislature to pass an act providing for the levy, under cer- tain specified circumstances, of a " special tax " by any county in the State, or whether it is essential, in order to authorize the levy for the very same purpose, to pass a sep- arate act specifically applicable to each county. I do not think that the organic law requires any such vain and use- less proceeding. I believe that the Legislature construed the Constitution properly in enacting that all c )unties, under certain clearly specified circumstances should have the power delegated to them to lay a special tax for the particular pur- pose of making up a deficiency in the appropriation for the maintenance of schools for four months of the year, and inci- dentally of relieving themselves of their liability to indict-

ment for failure to provide such schools for the requisite period.

A careful scrutiny of the cases cited by the Court in *Barksdale* v. *Commissioners*, 93 N. C , 476, will show that the Court had never, prior to the announcement of the doctrine in that case, held that the taxation provided for in section 6, Article V., should be so far local as well as special as to deprive the Legislature of the power to pass a special statute applicable to all counties alike under certain specified circumstances. The Court in the case at bar have advanced a step further than did Chief Justice SMITH in Barksdale's case, in declaring that the maintenance of schools is not a county purpose. Assuming that I have shown that the Constitution so characterizes it, it is difficult to conceive of a plausible reason for so limiting the power of the Legislature that it could not pass a special act applicable to a class of counties, where a certain state of affairs already existed or might arise in the future, instead of declaring in the case of each individual county, by a separate act, that if the appropriation of the next year should not be sufficient to accomplish a certain end, the Commissioners should be authorized to make a levy to supplement it.

But it would seem to have been intended, in framing the Constitution, to place the maintenance of public schools, like the payment of debts of the State, far above constitutional restrictions applicable to ordinary expenditures for State or county purposes. If the simple declaration of broad generalities in reference to preserving the public credit is sufficient to override the constitutional limit of taxation in order to meet the obligations of the State whenever created, and if the Commissioners are required, without any special statutory warrant for their conduct, to levy a tax in excess of the limit also to meet a debt of the county created before the limit was imposed (in 1868), it would seem to me altogether more reasonable to hold that the provision of the Constitution

which subjected the Commissioners to indictment for failure to keep the schools open for four months, gave them by implication, without the aid of an express statute, the power to disregard the restriction whenever it became essential to do so in order to meet the express requirement of section 3, Article IX. It is true, that in so far as section 1, Article V. impaired the remedy of a pre-existing creditor it was void, because it was repugnant to the Federal Constitution. But, in *University* v. *Holden*, 63 N. C., 410, all of the Justices concurred in the opinion that the Legislature had the power, in order to meet the interest on the public debt, whenever created, or to repel invasion, or in any great emergency, to disregard the limit. Justice SETTLE pointed out expressly the sections of Article IX. which we have quoted as enjoining the duty and giving the power to provide for public education without regard to the *per centum* of tax on property or the rate on the poll. There was a concensus of opinion in that case as to the principle that the General Assembly had the power to determine whether there is a necessity for transcending the restriction applicable only in ordinary cases. It seems clear to me that the Legislature not only has the power to determine when there is a necessity for exceeding the limit imposed upon the tax levy for ordinary expenditures in order to furnish the necessary school facilities, but whether the end can be attained by a general legislative levy only, or by empowering the counties to supplement the State appropriation, should it become manifestly necessary to do so. This view finds support in the fact, to which I have already alluded, that it is impossible for the Legislature to calculate what *per capita* rate and corresponding *per centum* on property will raise the sum necessary, when distributed according to the number of children and added to the local yield from fines and penalties, to maintain schools, some of which cost forty and some ten dollars per month for the prescribed period. In view of all these uncertain elements entering

into the estimate, which we must suppose were in contemplation of the delegates who ordained the provisons of the Constitution in reference to education, it seems to me impossible to give effect to all of the provisions of the organic law without granting to all County Commissioners power commensurate with their allotted duty and their liability for failure to discharge it. It is not practicable in any other way to devise a system that will operate uniformly, and at the same time furnish the requisite educational advantages; and it is essential to a compliance with all of the sections that it should so accomplish the end. *People* v. *Coleman*, 4 Cal., 46. Uniform laws are not necessarily universal in their operation, but a special law may affect alike all persons who may become in any way subject to it. *People* v. *Judge*, 17 Cal., 548; *McAurich* v. *Railroad*, 20 Iowa, 338. The question of uniformity in this case bears a striking analogy to that raised under the bankrupt law by reason of the inequality of exemptions in the different States, all of which were allowed by an amendment to the Federal law, yet it was expressly declared a uniform law. Bump., sec. 14, p. 375. The uniformity contemplated in framing Article IX., section 2, was in the minimum duration of schools, and that can be accomplished only by the intervention of the counties in their governmental capacities.

The doctrine of *stare decisis* can be invoked and insisted on only where, by acquiescence in a decision for a long time, it has become a rule of property, but inadvertent decisions, which can be corrected without disturbing titles, should be overruled at the earliest possible moment. Sedgwick on Stat. and Const. Law, 254; *Long* v. *Walker*, 105 N. C., 90; *Gaskill* v. *King*, 12 Ired., 223. Not a single title or vested right in the State depends upon our adherence to the decision in Barksdale's case.

Upon reviewing the dissenting opinion of the late Chief Justice MERRIMON in Barksdale's case, *supra*, I have been so

greatly impressed with the strength and force of the argument that it seems almost useless to have done more than refer to it as an embodiment of my reasons for differing with my brethren. This was indeed the *magnum opus* of a grand tribune of the people, whose heart responded to the sentiment which imbedded in the Constitution the obligation to educate the youth of the land, and lend a helping hand to those whose lot might be cast in the humble walks of poverty, but whose worth and talent might warrant them in aspiring to the highest positions.