J. R. COLLIE v. COMMISSIONERS OF FRANKLIN COUNTY.

(Filed 10 October, 1907).

**Taxation—Constitutional Law—Construction—Public Schools—Constitutional Limitations.**

The Constitution must be construed as a whole to give effect to each part, and not to prevent one article from giving effect to another article thereof, equally peremptory and important. While Article V of the Constitution is a limitation upon the taxing power of the General Assembly, Article I thereof commands that one or more public schools shall be maintained at least four months in every year in each school district in each county of the State, and should be enforced. Hence, Revisal, sec. 4112, providing that, if the tax levied by the State for the support of the public schools is insufficient to enable the commissioners of each county to comply with that section, requiring four months school, they shall levy annually a special tax to supply the deficiency, is constitutional and valid, though exceeding the limitation of Article V. Anything beyond would be void. *Barksdale v. Commissioners* overruled.

WALKER, J., and CLARK, C. J., concurring.

CIVIL ACTION, brought to August Term, 1907, of FRANKLIN Superior Court by the plaintiff and in behalf of other

taxpayers of Franklin County against the Board of Commissioners of said county, to restrain said board from collection of a tax levied at the meeting of June, 1907, of one cent on the $100 worth of property and three cents on each taxable poll, for the support and maintenance of the public schools of the county, in addition to and beyond the limit of 66⅔ cents on the $100 worth of property and $2 on each taxable poll, levied for general State and county purposes in said county in said year.

Plaintiff obtained from *Hon. C. M. Cooke,* Judge resident of the Fourth Judicial District, a temporary restraining order, returnable before himself. Upon the hearing his Honor dissolved the restraining order, and plaintiff appealed.

*William H. Ruffin* for plaintiff.
*F. S. Spruill, Charles B. Aycock* and *R. B. White* for defendant.

BROWN, J. It is admitted that the questions presented by this appeal have been passed upon adversely to the contention of the defendant in two cases—*Barksdale v. Commissioners,* 93 N. C., 473, and *Board of Education v. Commissioners of Bladen,* 111 N. C., 578. We are now asked to review those cases and disregard them as precedents in the decision of this case. As those cases involve a construction of certain sections of the Constitution relating to a question of taxation, and involve no right affecting the life, liberty or property of the citizen, we can see no reason why they should continue to guide us if time and reflection have convinced us that they are not correct interpretations of the letter and spirit of our organic law. We are not lacking in respect for the opinion of the eminent Judges who decided those cases, because we happen to differ from them in our efforts to gather from that instrument the true intent and purpose of its framers. The doctrine of *stare decisis* is worthy of all respect, and should be accorded due weight in the consideration of all cases, but

the doctrine, where it does not involve the rights of the citizen, should not be carried to that extreme where it becomes an obstruction to the carrying out of other provisions of the Constitution intended to promote the progress, prosperity and welfare of the people. Again, it must be remembered that the cases cited are somewhat weakened as authoritative precedents by dissenting opinions in each of acknowledged power and force of reason. Section 1, Article V, of the Constitution directs the levying of a capitation tax by the General Assembly "which shall be equal on each to the tax on property valued at $300 in cash." * * * "And the State and county capitation tax combined shall never exceed $2 on the head." Section 6 of the same article enacts that "The taxes levied by the commissioners of the several counties for county purposes shall be levied in the like manner with State taxes, and shall never exceed the double of the State tax, except for a special purpose, and with the special approval of the General Assembly." Article IX of the Constitution, after declaring that "religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education should be forever encouraged," commands, in section 3 thereof, that one or more public schools shall be maintained at least four months in every year in each school district in each county of the State; and further provides that, "if the commissioners of any county shall fail to comply with the aforesaid requirements of this section, they shall be liable to indictment." At every session the General Assembly has endeavored to give effect to this section of the Constitution by providing that, if the tax levied by the State for the support of the public schools is insufficient to enable the commissioners of each county to comply with that section, they shall levy annually a special tax to supply the deficiency, to the end that the public schools may be kept open for four months, as enjoined by the Constitution. Revisal, sec. 4112. It is admitted that, in the *Barksdale*

*case,* this Court held that the sections quoted from Article V are a limitation upon the taxing power of the Legislature and control Article IX; so that, if the taxes levied in accordance with that limitation and equation are insufficient to support the public schools for four months, the commissioners cannot be compelled to levy more, and that the act of the General Assembly requiring it is void. The *Barksdale case* was approved and followed in the *Bladen case,* and the matter so exhaustively discussed in the opinions of the Court and of the dissenting Judges in both cases that it is difficult to add anything new to the controversy, and it is unnecessary to repeat the arguments set forth in their opinions. We agree with the Court in those cases, that Article V is a limitation, generally, upon the taxing power of the General Assembly. Nor are we called upon to hold that the tax to supplement the school fund in each county, directed by the statute to be levied in case of need, may be upheld as a "necessary county expense" or as a "special tax" for a special purpose. It is unnecessary, in the construction we give to the Constitution, to place our decision upon any such grounds. We hold, with *Mr. Justice Merrimon* in the *Barksdale case,* that, while this limitation upon the taxing power of the General Assembly prevails generally, it does not always prevail, and that it should not be allowed to prevent the giving effect to another article of the same instrument equally peremptory and important. We must not interpret the Constitution literally, but rather construe it as a whole, for it was adopted as a whole; and we should, if possible, give effect to each part of it. The whole is to be examined with a view to ascertaining the true intention of each part, and to giving effect to the whole instrument and to the intention of the people who adopted it. Coke Lit., 381a; Cooley Const. Lim. (7th Ed.), p. 91.

Of the two constructions which have been given it in the cases cited, we prefer to adopt that which, while properly limiting the power of taxation as to matters not embraced in

the Constitution, leaves it within the power of the Legislature
to give effect to one of its most important and peremptory
commands.    While the General Assembly must regard such
limitation upon its power to tax, as defined in many decisions
of this Court, when providing for the carrying out of objects
of its own creation and the ordinary and current expenses of
the State government, yet, when it comes to providing for
those expenses especially directed by the Constitution itself,
we do not think the limitation was intended to apply.  Al-
though the Legislature must observe the ratio of taxation
between property and the poll provided in Article V, section
1, it is not required to obey the limitation upon the poll and
the property tax, if thereby they are prevented from giving
effect to the provisions of Article IX.    It is better, we think,
to hold that.such limitation applies to legislative creations,
rather than let it hinder constitutional commands.    The pur-
pose of our people to establish by taxation a general and uni-
form system of public schools, wherein tuition shall be free
of charge to all the children of the State, and that such schools
should be open every year for at least four months, is so
plainly manifest in Article IX of the Constitution that we
cannot think it possible they ever intended to thwart their
clearly expressed purpose by so limiting taxation as to make
it impossible to give effect to their directions.    The reasons
which induced the people to adopt Article IX are set forth in
its first section, and they are so exalted and forcible in their
nature that we must assume that there is no article in our
organic law which the people regarded as more important to
their welfare and prosperity.    This conviction is greatly
strengthened when we find that the only criminal offense de-
fined and made indictable by the instrument is one created
especially to enforce obedience to its specific commands in
respect to the establishment of four-months schools.    In com-
menting upon this *Mr. Justice Avery* well says: "It is diffi-
cult to understand why this wide departure from the usual

course was made, unless we interpret it as emphasizing the intent of the framers of the Constitution that the officers held subject to this unusual liability should have power coextensive with their accountability." *Board v. Commissioners,* 111 N. C., 585.

"Schools and the means of education shall forever be encouraged," says the Constitution. Why? Because they foster religion and morality, which, with knowledge, are necessary to good government. The people expressed their willingness to incur such expense because of the great good resulting therefrom. It is hardly probable they intended by a previous enactment in the same instrument to render it impossible to carry out purposes expressed in such earnest and unmistakable language. Our people regarded the subject of education as of the highest and most essential importance, and there is no provision in our Constitution which is clearer, more direct or commanding in its terms than Article IX. As said by *Judge Merrimon,* "Its framers, whatever else may be said of their work, seem to have been especially anxious to establish and secure beyond peradventure a system of free popular education." *Barksdale's case,* 93 N. C., 483. This sentiment has grown greatly in the hearts and minds of our people since that section of the Constitution was adopted. So great has been its growth that they have in recent years adopted an educational qualification as a prerequisite to exercising the electoral franchise. Const., Art. VI, sec. 4. This places an additional obligation upon us to provide full educational facilities for the youth of the State, who otherwise may grow up in ignorance and be disqualified to take their just part in the administration of our government.

The construction placed upon the Constitution by the *Barksdale* decision has been found to be an especial handicap upon the country schools. In the cities and towns, generally, special taxes are levied by a vote of the people, graded schools established, and the requirements of the Constitution more

than complied with. Very many country schools cannot continue open for four months unless the tax prescribed by the act is levied. The country school is the nursery of the larger part of the bone and sinew of this land. It carries a greater responsibility than the city schools in proportion to its advantages, for, as is well said by a recent writer, "It is charged not only with its own country problems, but with the training of many persons who swell the population of cities. The country school is within the sphere of a very definite series of life occupations."

Thus it is seen that Article V vitally affects all the leading purposes of the Constitution. It, therefore, becomes more imperative than ever that, if it reasonably can be done, we should give the instrument that construction which will effectuate and carry out its wise and beneficent provisions. We think we do this when we hold that the limitation contained in Article V was not intended to restrain and trammel the General Assembly in providing the means whereby the boards of commissioners of the different counties are enabled to perform the duties enjoined by the Constitution and give to the people public schools for at least four months in each year. Instead of prescribing the rate of tax to be levied for the purpose of a four-months school, the General Assembly properly and wisely left the amount to be levied to be determined by the county authorities of each county. In some counties it may not be necessary to levy any tax, while in others some tax, differing in amount, will have to be levied and collected in order to carry out the directions of the law. In levying the tax the boards of commissioners must observe the equation between property and poll fixed in the Constitution. In estimating the tax necessary beyond the limit of $66\frac{2}{3}$ cents on property and $2 on the poll to give a four-months term, no longer period may be considered. When the four-months requirement is fulfilled, the limit of taxation fixed in Article V necessarily takes effect, and any-

thing beyond that would be void. The taxes levied and collected in pursuance of the act constitute a special fund, supplemental to the general school fund, and must be devoted exclusively to procuring four-months terms of the public schools in those counties or districts only where, for lack of funds, they are kept open for a shorter period.

After careful consideration of the matter, we are of opinion that the judgment of the Superior Court dissolving the restraining order should be

Affirmed.

WALKER, J., concurring: The provisions of the Constitution having any special bearing upon the question presented in this case are as follows:

"The General Assembly shall levy a capitation tax on every male inhabitant of the State over twenty-one and under fifty years of age, which shall be equal on each to the tax on property valued at $300 dollars in cash." Art. V, sec. 1.

"The proceeds of the State and county capitation tax shall be applied to the purposes of education and the support of the poor, but in no one year shall more than twenty-five per cent. thereof be appropriated to the latter purpose." Art. V, sec. 2.

"The taxes levied by the commissioners of the several counties for county purposes shall be levied in like manner with the State taxes, and shall never exceed the double of the State tax, except for a special purpose, and with the special approval of the General Assembly." Art. V, sec. 6.

"Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Art. IX, sec. 1.

"The General Assembly, at its first session under this Constitution, shall provide, by taxation and otherwise, for a general and uniform system of public schools, wherein tuition

145—12

shall be free of charge to all the children of the State between the ages of six and twenty-one years." Art. IX, sec. 2.

"Each county of the State shall be divided into a convenient number of districts, in which one or more public schools shall be maintained at least four months in every year; and if the commissioners of any county shall fail to comply with the aforesaid requirements of this section they shall be liable to indictment." Art. IX, sec. 3.

"All moneys, stocks, bonds and other property belonging to a county school fund, also the net proceeds from the sale of estrays, also the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal or military laws of the State, and all .moneys which shall be paid by persons as an equivalent for exemption from military duty shall belong to and remain in the several counties and shall be faithfully appropriated for establishing and maintaining free public schools in the several counties of this State: *Provided,* that the amount collected in each county shall be annually reported to the Superintendent of Public Instruction." Art. IX, sec. 5.

"No county, city, town or other municipal corporation shall contract any debt, pledge its faith or loan its credit, nor shall any tax be levied or collected by any officers of the same, except for the necessary expenses thereof, unless by a vote of the majority of the qualified voters therein." Art. VII, sec. 7.

It is a well-recognized rule in the interpretation of constitutions—and the same principle extends to statutes and contracts—that, in case of any ambiguity, the whole instrument must be examined and considered, in order to determine the meaning and legal effect of any part of it; and the construction should be such as to give effect to the entire instrument, and not raise any conflict between its several provisions, if this can possibly be avoided. Black's Const. Law, p. 67, sec. 41. There is one case in our Reports which has been cited

frequently as establishing the doctrine that the provisions of the Constitution are all mandatory—*State v. Patterson,* 98 N. C., 660.   I have never been able to give the full assent of my mind unreservedly to this proposition, broadly stated as it is in that case and as it has been construed by this Court to be.   A large part of our present Constitution was not the voluntary expression of the will of our people, for many of the most intelligent of them were, at the time it was adopted, under the ban of proscription and were not permitted to take any part in framing it.   But, notwithstanding this deplorable fact, it contains many commendable features, and among them those which I have already quoted, and which, in my opinion, are of such an important and essential nature as to be mandatory upon us.   When the people have clearly ordained what shall be done, we, as Judges, have nothing to do but to obey and to execute their will.   Whether the particular provisions in question are wise or unwise is not for us to determine.   We must give proper effect to each part, and to the whole, so as to fully execute the general purpose, if possible, with harmonious precision.   After a most careful reading again of the entire Constitution of our State, and a study of its general scope, and the specific purpose of its framers, as shown in its several provisions concerning public schools and taxation, I am constrained to believe that the duty of educating the people, as enjoined by the Constitution, is one of its leading and controlling ideas, and was so intended to be, and the plan devised for providing the necessary means of discharging this duty was considered in the general scheme of taxation to be of paramount importance.   In Article IX the very first declaration is, that religion, morality and knowledge lie at the very foundation of all good government.   And who can doubt the correctness of this proposition?   They are the essential prerequisites, if I may so speak.   Without intelligence, properly cultivated and directed, good government would be almost impossible, espe-

cially where the particular form of State policy depends so largely upon the will of the people, as it does in a representative democracy.    I may go further and assert that this principle is applicable generally to all forms of society and lies at the foundation of all human institutions.    Good government begins at the fireside, is nourished in the schoolhouse, and gradually developed in the council chamber and legislative halls, on the hustings and in the forum, and refined, purified and ennobled by the holy precepts of religion and morality as taught and inculcated in the sanctuaries of the people. What the State needs to make her great and prosperous is good minds and good men.    She is apt always to have the beneficent influence of good women in her homes.    Education, religion and morality must be the cornerstones of all successful government.

I have made these general observations for the purpose of showing that the provisions of the Constitution as to the education of the masses being of supreme importance, it must of necessity be held to be something apart from others not relating to that subject, and to be highly mandatory.    It cannot be subject to any limitation of taxation, for the very terms by which the duty to educate the people is enjoined are altogether independent of the provision establishing a limitation of the taxing power, and are just as imperative.

· It was necessary to support the government, and, therefore, to provide it with the means of defraying its expenses by taxation, the only method by which this could be done.    It was well to prescribe an equation or ratio of taxation, and consequently a limit, beyond which the taxing power should not be permitted to impose burdens upon the people, as is done in the Constitution; but it is a grave mistake, I think, to suppose for a moment that this limitation, which, of course, is finally determined by the proportion of taxation and the maximum of the poll tax, was intended to have any necessary connection with the other provisions in regard to the duty to

COLLIE *v.* COMMISSIONERS.

educate the people.    The two articles are, and were manifestly intended to be, separate and distinct.    The public schools *must* be kept open for the required time, and at the same time the government, both State and local, must likewise be maintained.    One is just as mandatory as the other.

The prohibition of the Constitution against doubling the State tax for county expenses, except for a special purpose, and then only with the special approval of the General Assembly (Art. V, sec. 6), has no essential relation to the educational article of the Constitution, as, by the express language of Article V, section 6, it is restricted to taxation for county purposes, strictly speaking—that is, those which arise in the ordinary administration of county affairs; nor can it be successfully asserted that the education of the people is a "special purpose," within the meaning of that section.    It is emphatically a general one, and of the first importance, and is so clearly defined to be in Article IX.    It may well be conceded that the just and equitable principle involved in the equation of taxation may be beneficially applied to all forms of taxation and for all purposes, as this Court held should be done in the case of taxation by cities and other public or municipal corporations, under Article VII, section 9 (which, by examination, will be found to bear a close resemblance to the provisions of Article V, section 3, requiring uniformity in the taxation of property at its true value, or, as it is sometimes expressed, *ad valorem*)—*Redmond v. Commissioners,* 106 N. C., 122; *Young v. Henderson,* 76 N. C., 420; *French v. Wilmington,* 75 N. C., 477—although, by the same authorities, it was adjudged that the rule in regard to the limitation of taxation did not apply to such corporations.

In passing, I may remark that I do not take the view of Article V, section 6, which seems to be indicated in several opinions of this Court, namely, that the doubling of the State tax for county purposes has any necessary connection with either the equation or limitation of taxation.    This prohibi-

tion against counties exceeding the double of the State tax may, in practice, well come into play before the limit of taxation—that is, 66⅔ cents on the $100 worth of property—is ever reached. For illustration: The State tax may be as low as 10 cents on the $100 of property at its true value, in which case the county might double, or levy a tax of 20 cents, making a total of State and county taxation equal to 30 cents on the $100 in value of property. The rate would be still short of the limit by 36⅔ cents. The extreme limit of taxation prescribed to the counties, and the largest levy that could be made by them under this provision (Article V, section 6), would be reached only where the State should levy a property tax of 22 2-9 cents on the ˙$100 dollars of value, when the counties could levy 44 4-9 cents without the special approval of the General Assembly or for a special purpose. The limit prescribed to the counties would, of course, be decreased in the proportion that the rate should be increased for State purposes. Even where the general limit of taxation is not reached by the counties in doubling the State tax, they would have no power under Article V, section 6, to increase their rate, except for the purpose therein specified, and with the special approval of the General Assembly. If the rate for State purposes is 20 cents, that of the counties must not be over 40, unless an increased rate is constitutionally authorized by the General Assembly.

The general limit of taxation is fixed, of course, at 66⅔ cents on the $100 in value of property, as I have already indicated, by the provision in regard to the equation, and the maximum of the poll tax, which is $2 on the $300 of property at its true value in cash. Const., Art. V, sec. 1. All the above provisions were evidently intended to apply to taxes laid for general State and county purposes, and could not by any admissible rule of interpretation apply to the taxes required for the support of the schools. It was regarded of such momentous importance to educate the people that a

separate and distinct provision was made for that purpose and an entire article of the Constitution devoted to the subject, the only restriction imposed upon the power to tax for the education of the people being the provision which requires that one or more public schools shall be kept open at least four months in every year in each school district. Article IX, section 3 (2 Revisal, p. 618). This requirement was considered as so vital to the welfare of the State that it was made indictable if the officers who were charged with this supreme duty failed to comply with this plain mandate of the Constitution. When a duty is prescribed, or when a power is conferred by the Constitution, or even by statute, every means and every other power necessary to execute the primary purpose is also considered as granted. It is distinctly enjoined by the Constitution that the people shall be educated, and for this purpose it is ordained that there shall be a "general and uniform system of public schools," with free tuition to all children between the ages of six and twenty-one years; and it is further commanded that the General Assembly shall, even at its first session, provide, by *taxation and otherwise,* for the execution of that provision. Can we escape the conclusion that the framers of the Constitution of 1868, as amended in 1875, intended that commissioners of the counties should do a certain thing, with a heavy penalty imposed in case of their default, and yet be deprived of the power of performing their duty? What an imperfect syllogism and what an impotent conclusion! When we concede the duty as a correct premise, the opposite result is inevitable, if we reason logically. The chief purpose of the framers of the organic law was, that the people should be educated, without regard to the raising of the necessary expenses of government for other purposes; but, according to the only true principle of democracy (using that word as describing a particular form of government and not in any partisan sense), that no more of the people's earnings should be exacted of them than is

COLLIE *v.* COMMISSIONERS.

necessary for the support of their government, economically administered, which should really be the true principle of taxation in all government, whatever may be its form.

It is true the people have agreed to support their government in all its branches by the method of taxation, consisting in reasonable impositions laid upon persons and property, by a standard which they deemed fair and just to all; but their leading desire was that their children should receive the advantages of education, so that not only should the government proceed in the exercise of its ordinary functions for their benefit and advantage, but that the people of the State should be elevated in the scale of intelligence and prepared to enjoy the true blessings of liberty and prosperity for which the compact of government was formed, and, moreover, to further advance their welfare and happiness. This was of the first consideration.

I am now brought to my second proposition—whether the education of the people is so far required by the organic law as to have become a necessary expense of the government, within the meaning of Article VII, section 7, of the Constitution. It is not for me to say, in construing that instrument, whether its provisions make for the best interest of the people. I must ascertain the will of the people from what they have said, and not from what I think they should have said—not meaning at all to imply that they have not spoken wisely, and truly expressed their intention. If there is a deliberately conceived and carefully stated principle in their Constitution, and one which it is perfectly evident they desired to be clearly understood and rigidly enforced, it is that embraced in sections 1, 2 and 3 of Article IX, in regard to the schooling of the children of the State. They intended that the State should no longer be debased or retarded in its progress by the ignorance of its people. It is plain that those who wrote these sections knew, as any intelligent citizen knows, that the surest way to obtain good government, and to enjoy it, is to

know how to appreciate its blessings and to be able to perpetuate· it by a proper and intelligent use of it.    When it was, therefore, declared that the people *must* be educated, it was just as binding an injunction that the means to that end must be supplied by taxation as it was that· the counties or even the State government should be supported.   · Why not? It became, therefore, by the very terms of the command, a public necessity, because the people, in their Constitution, have so declared, and, logically, therefore, a necessary expense.

Why is one essential mandate of the Constitution any more binding, or obedience to it any more obligatory, than another? What the framers of the Constitution meant was this:  That the State and county governments should be maintained by taxation (with certain qualifications), which should be laid upon a principle of equation or due proportion between property and taxes, and within a certain limit; but that, in addition to this sovereign power and corresponding duty, so necessary to the vigorous life of the government, there should be another, which is equally vital to its continuance under just and wise laws, and that is the separate and independent right to educate the people, by taxation also, to the extent that it might be necessary to keep open to all the children between certain ages the public schools of the State for *"at least* four months in every year."    Const., Art. IX, sec. 3.

To my mind, at least, it is perfectly clear that this power of taxation, in order to educate and enlighten the people, is not in any way subject to the provision as to the limit of taxation fixed by other articles and sections of the Constitution, but what is known as the equation may be just and not necessarily inconsistent with Article IX, and perhaps should be observed. It is not required now that I should express any binding opinion as to this matter.    When the Constitution prescribes only one limit to taxation for school purposes, as I have

shown has been done by the clearest implication, we, as a court, have no right to substitute another.

It is provided by Article V, section 2, that a specified part of the proceeds of the State and county capitation tax shall be applied to the purposes of education, and by Article IX, sections 4 and 5, that certain property therein enumerated shall also be applied to the same purpose; but if this is not sufficient to keep the schools open as required to be done by Article IX, section 3, then it is the paramount duty of the Legislature to provide by taxation for a strict compliance with the latter section, without regard to any restriction on taxation, except in the respect herein already indicated.

It may be a question worthy of serious reflection whether, by the recent amendments to the Constitution, which relate to suffrage and which were adopted for the purpose of securing an intelligent electorate, and prescribing an educational test for the voter, it has not become the duty of the State to educate her people, and, by reason thereof, such education has become a necessary expense, to be met by appropriate taxation, imposed as in like cases, as I have already substantially argued.    Those amendments to our organic law were, in my opinion, at least, as now advised, lawfully passed and ratified, and were a rightful and sagacious exercise of the power of the people of this State, under the Federal Constitution, to protect themselves at the ballot box against the untold consequences of ignorance, illiteracy and vice.    What is more essential to good government and the peace and good order of society than that the voter should be able to intelligently decide *for himself* upon all public questions which concern the general welfare, and to select honest and capable men to represent him in the offices and councils of the State?    And wherein is there any departure from constitutional principles if each man is given a fair chance by the law to qualify himself to exercise this important right and principle, when the people rule and declare what this law shall be?    That is all.

these amendments seek to secure; and if there is anything to be found in the Constitution of the State or of the United States that will prevent a consummation so devoutly to be wished, it would be strange, indeed, and every canon of construction should exclude such a meaning of its provisions unless it has been most plainly and clearly expressed. There must be no loose implication in favor of it. But these amendments have imposed the duty upon the State to prepare its people to enjoy the rights and advantages that will accrue from self-government by qualifying them to exercise the elective franchise, and in order to do this it perhaps became a public necessity that the schools be kept open, as required by the Constitution, so that the benefits of education can be accessible to all.

CLARK, C. J., concurring: The requirement of the Constitution (Art. IX, sec. 3) that the "public schools shall be maintained at least four months in every year" (besides making the county commissioners in any county failing to do this indictable), and the prohibition in the Constitution (Art. V, sec. 1) that the State and county taxation shall not exceed 66⅔ cents upon the $100, are both imperative. There should have been at no time any difficulty in enforcing both. The trouble has been to find between the amount levied for State taxes, when added to that required for four-months schools, and the 66⅔ cents limitation, a margin of taxation large enough to defray the necessary expenses of the county. In thirty-eight counties such margin is large enough to provide for necessary county expenses, but in fifty-nine counties it is not.

The error has been in assuming that in such case the necessary expenses of the county came first. Such is not the mandate of the Constitution. The maintenance of schools for four months in each county is imperatively commanded. If the margin left is not sufficient to raise enough money to de-

fray the necessary expenses of the county, taxes for that purpose can be levied, without a vote of the people, by approval of the General Assembly. Const., Art. V, sec. 6, and Art. X, sec. 7; *Vaughan v. Commissioners,* 117 N. C., 429. That permission has been, practically, though perhaps not very explicitly, given by the statutes authorizing and requiring county· commissioners to provide for the county purposes named in the laws concerning them.